UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ZENA PITTS,

     Plaintiff,

v.                                                        Case No. 8:21-cv-2033-VMC-CPT

GEOVERA SPECIALTY
INSURANCE COMPANY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

     Before me on referral are Defendant GeoVera Specialty Insurance Company's (GeoVera) motion for summary judgment (Doc. 51); Plaintiff Zena Pitts's motion to strike certain evidence from GeoVera's summary judgment motion (Doc. 52); and Pitts's motion for summary judgment (Doc. 54). For the reasons discussed below, I respectfully recommend that GeoVera's summary judgment motion be granted in part and denied in part and that Pitts's motions be denied.

I.

     Pitts is the owner of a rental property located in Sarasota, Florida, which she insured with GeoVera for a period of time, including—of relevance here—from May 2020 through May 2021. (Doc. 51 at 3, ¶2); (Doc. 51-1 at 1); (Doc. 53 at 2, ¶2). In

addition to her policy with GeoVera, Pitts had a home warranty policy for the rental property with ARW Home Service Company, LLC (ARW) between 2015 and at least December 2020.  (Doc. 51 at 9, ¶16); (Doc. 51-3 at 21); (Doc. 53 at 3, ¶16).

In early September 2019, Pitts reported to ARW that her bathtub drain was clogged.  (Doc. 51-3 at 18).  Although she initially made a claim to ARW for this issue, she ultimately cancelled the claim before the reason for the stoppage could be determined because the clog resolved itself.  *Id.*; (Doc. 53-1 at 4).  In early April 2020, Pitts reported another blockage in the bathtub drain and, this time, a servicer investigated the matter and was able to rectify it.  (Doc. 51-3 at 19).  Pitts avers in an affidavit she includes with her summary judgment motion that she believes both of the above stoppages were "caused by the[ tenant's] children putting toys and food down the drain."  (Doc. 53-1 at 4, 5).

A few days after the second blockage, on April 10, 2020, GeoVera mailed Pitts a packet of materials in connection with Pitts's renewal of her policy with the company.  These materials consisted of, among other things, a copy of Pitts's policy, certain amendments to the policy, as well as various notices.  (Doc. 51-1 at 1).  Of import to the parties' summary judgment motions, one of the notices "highlight[ed] a significant coverage restriction" found in an endorsement[1] titled "Water Damage Exclusion and Limited Named Peril Coverage" (hereinafter, Water Damage Endorsement), which GeoVera had added to the policy "based on certain

---

[1] As defined by GeoVera, "endorsements" are "amendments that may add, delete, or exclude coverage(s)."  (Doc. 51-1 at 6).

underwriting criteria and/or [a] request[ ] by [Pitts] for a premium credit."[2]   *Id.*
GeoVera explained that this new provision would limit Pitts's water damage coverage
"to only water damage resulting from a covered loss caused by [one of nine] named
peril[s]."   *Id.*   A copy of the Water Damage Endorsement was provided in the packet
as well.   *Id.* at 64–65.

Pitts does not appear to dispute that GeoVera sent her the packet of materials
on April 10, 2020.  She states, however, that she "does not believe she received" these
items and that, in any event, GeoVera never called her to describe "how it substantially
changed her policy from prior years."  (Doc. 53 at 2).  Even with this caveat, it is
uncontested that Pitts continued her policy with GeoVera during the pertinent period,
notwithstanding the addition of the Water Damage Endorsement.  (Doc. 51 at 3, ¶2);
(Doc. 51-1 at 1); (Doc. 53 at 2, ¶2).

Following the renewal of her policy with GeoVera, Pitts's rental property
continued to experience plumbing issues.  In mid-May 2020, Pitts advised ARW that
there was a blockage in the toilet in the same bathroom where the bathtub had been
previously clogged and that she believed this issue stemmed from "tree roots growing
into her piping."  (Doc. 51-3 at 20).  Roughly two months later, in July 2020, Pitts
reported to ARW that "water [was] leaking from behind [the] toilet wall and then on
the other side of wall in the kitchen[,] behind the refrigerator when [her tenant was

---

[2] According to GeoVera, the possible justifications for this modification consisted of, *inter alia*, Pitts
having reported more than one water damage claim in the prior three years and/or the plumbing and
heating system at the rental property not having been updated in the previous forty years.  *Id.*

taking] a shower." *Id.* at 21. Pitts opted on this occasion to hire her own servicer and to seek reimbursement from ARW afterwards. *Id.* While Pitts told ARW at the time that she thought the "refrigerator drip pan" was the source of the leak, there are no records indicating what the actual cause of the problem was. *Id.*

On December 2, 2020, Pitts's tenant at the property complained that water was running from the bathroom into the hallway when the tenant was showering. (Doc. 51 at 9, ¶¶ 17, 19); (Doc. 53 at 3–4, ¶¶ 17, 19). According to the parties' submissions, this water overflow was apparently due to a leak or some other failure in the plumbing system caused by wear and tear. (Doc. 1-1 at 2); (Doc. 51-5 at 4); (Doc. 53 at 1, 5). Pitts asserts that, as a result of this incident, she sustained water damage in the hallway bathroom and other portions of the home. (Doc. 63 at 2–3).

Two days later, on December 4, 2020, Pitts filed a claim with GeoVera for "water overflow and/or accidental discharge" into the residence. (Doc. 51 at 9, ¶18); (Doc. 53 at 4, ¶18). As part of that claim, Pitts requested compensation for the damage caused by the water, as well as for the costs to tear out the drywall and flooring materials so that the defective plumbing line could be accessed and repaired (otherwise known as "access-to-repair" costs). (Doc. 51 at 9, ¶18); (Doc. 51-2 at 77, 80); (Doc. 51-4 at 2–3); (Doc. 53 at 4, ¶18). GeoVera investigated the matter and notified Pitts soon thereafter via a letter that her policy did not cover the claimed water damage or the expense needed to repair or replace the plumbing line. (Doc. 51 at 9, ¶19); (Doc. 51-2 at 80); (Doc. 53 at 4, ¶19). GeoVera specifically referenced the Water Damage Endorsement in this denial letter. (Doc. 51-2 at 78–80).

The next month, in January 2021, Pitts brought this action in state court seeking a declaratory judgement that her policy with GeoVera covered the access-to-repair costs associated with repairing the plumbing issue. (Doc. 1-1). Roughly seven months later, in August 2021, GeoVera removed the action to this Court based on the Court's diversity jurisdiction. (Doc. 1).

After GeoVera filed its answer (Doc. 13), the Court issued a Case Management and Scheduling Order (CMSO) establishing, of significance here, an October 7, 2021, deadline for the parties' mandatory initial disclosures under Federal Rule of Civil Procedure 26(a); deadlines in January, February, and March 2022 for the parties' expert reports; an April 1, 2022, deadline for discovery; and a May 2, 2022, deadline for any summary judgment motions. (Doc. 14).

During the months of September and October 2021, the parties exchanged their initial disclosures pursuant to Rule 26(a). (Docs. 59-1, 59-2). Of consequence to the issues before the Court, GeoVera informed Pitts in its disclosures that the persons who had material and discoverable information regarding GeoVera's claims and defenses included "[a]ll witnesses listed in [Pitts]'s Rule 26[a] disclosures or otherwise identified or disclosed by [Pitts]." (Doc. 59-1 at 3–4). For her part, Pitts represented that a "Representative for ARW" would potentially have pertinent information relative to Pitts's claims or defenses because Pitts "purchased a home warranty from ARW." (Doc. 59-2 at 3). Pitts further advised GeoVera that ARW had documents "which may be relevant to the case" as well, and that such items had been or would be "produced in response to written discovery." *Id*. Pitts qualified these disclosures,

however, with the disclaimer that it was her position the ARW warranty "did not cover the subject issues." *Id.* Seemingly related to these disclosures, Pitts contacted ARW in October 2021, requesting that her policy number and "the terms and conditions [of her policy be] sent to her." (Doc. 51-3 at 22).

In early November 2021, GeoVera issued a subpoena to ARW, seeking documents pertaining to Pitts's warranty with ARW and any claims she made in connection with that policy. (Doc. 52-1). Pitts received proper notice of this subpoena[3] and asked that GeoVera forward her copies of any materials it received from ARW. (Doc. 52-2).

In its response to GeoVera's subpoena dated November 15, 2021, ARW provided GeoVera with a copy of the agreement between Pitts and ARW, various records describing Pitts's claims to ARW for water damage prior to the start of the relevant policy period, and a declaration from a records custodian, Evan Rothman, attesting to the authenticity of the items produced by ARW. (Doc. 51-3); (Doc. 59 at 4–5). GeoVera, however, neglected to turn these records over to Pitts in the weeks and months that immediately followed its receipt of same (Doc. 52 at 4–5) but did include them with its motion for summary judgment filed on March 8, 2022 (Doc. 51).

The day after GeoVera filed its summary judgment motion, Pitts again requested that GeoVera send her the ARW materials and added that she wished to depose Rothman before the March 29, 2022, deadline for her response to GeoVera's

---

[3] Pitts made this representation to the Court at oral argument on the motion to strike.

summary judgment motion.  *Id*.  GeoVera provided Pitts with the sought-after items two days later, on March 11, 2022, and told her on March 18, 2022, that it would be available to depose Rothman on either March 24, 2022, or March 25, 2022.  *Id.* at 5. Pitts though did not attempt to schedule Rothman's deposition until March 23, 2022, and was apprised by ARW at the time that the deposition could not be conducted on such short notice.  (Doc. 52 at 5); (Doc. 59 at 6).  Pitts did not engage in any further efforts to depose Rothman prior to the April 1, 2022, discovery deadline (Doc. 14), nor did she ask the Court to extend either the discovery deadline or the deadline for her to respond to GeoVera's summary judgment motion.

Instead, Pitts filed the instant motion to strike on March 29, 2022, requesting that the Court disregard both the ARW documents and the Rothman declaration attached to GeoVera's summary judgment motion.  (Doc. 52).  That same day, Pitts also submitted its response to GeoVera's summary judgment motion (Doc. 53) and, in short order, filed its own motion for summary judgment as well (Doc. 54).

Each party has since replied to their opponent's response (Docs. 60, 63) and provided the Court with one or more notices of supplemental authority (Docs. 64, 66–68), the last of which was filed in August 2022 (Doc. 68).  During this intervening period, as alluded to above, the Court heard argument on Pitts's motion to strike.  The parties' motions are thus ripe for the Court's consideration.

II.

I commence my analysis with Pitts's motion to strike the ARW evidence included with GeoVera's summary judgment motion.  (Doc. 52).  In support of this

7

request, Pitts argues that GeoVera should not be allowed to rely on these items because GeoVera did not timely turn them over to her as mandated by Rule 26(a).  *Id.*

Rule 26(a) provides, in relevant part, that a party must disclose to its adversary at the outset the names and contact information "of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  Rule 26(a) further provides that a party must also disclose copies "of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(ii).

Rule 26(e), in turn, requires a party to supplement these initial disclosures "'in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.'"  *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019) (quoting Fed. R. Civ. P. 26(e)(1)(A)).  For a supplement to be deemed "timely" under Rule 26(e), it does not have to be made on "the same day [that the party] learn[s] about new information or witnesses."  *Jordan v. IAP Worldwide Servs., Inc.*, 2019 WL 13152019, at *4 (M.D. Fla. Oct. 23, 2019) (citations omitted).  Rather, it need only "be made at appropriate intervals during the discovery period," and with "special promptness" as the discovery deadline and the trial date approaches.  Fed. R. Civ. P. 26(e) advisory

8

committee's note to 1993 amendment; *see also In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 246224, at *3 (N.D. Fla. Jan. 25, 2021) (noting that the timeliness of supplementation under Rule 26 is also generally tied to the discovery deadline established by the court).

Supplemental discovery that is not provided in a timely manner is subject to exclusion under Rule 37(c) unless the belated disclosure was "substantially justified" or "harmless." *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014) (quoting Fed. R. Civ. P. 37(c)). Courts in this District typically weigh the following five factors in assessing whether a failure to tender evidence in a punctual manner meets one or both of these standards:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Bendik v. USAA Cas. Ins. Co.*, 2019 WL 9466018, at *2 (M.D. Fla. Oct. 25, 2019) (collecting cases) (citations and internal quotation marks omitted). The dilatory party bears the burden of demonstrating that a consideration of these factors militates in its favor. *Tech Data Corp. v. Au Optronics Corp.*, 2015 WL 12843886, at *5 (M.D. Fla. Oct. 22, 2015) (citation omitted). In the end, a district court has broad discretion in deciding whether to exclude evidence under Rule 37(c). *Guevara*, 920 F.3d at 718.

In this case, GeoVera asserts that to the extent it was obligated to supplement its initial disclosures with the items it obtained from ARW, its delay in doing so was substantially justified or harmless. (Doc. 59). I agree.

Starting with the first factor, Pitts cannot credibly claim she was surprised by the ARW disclosures. In GeoVera's answer filed in August 2021, it asserted as one of its affirmative defenses that insofar as "Pitts's alleged loss and/or damages were caused by preexisting conditions, such loss and/or damage is excluded from coverage, as preexisting damages are specifically excluded by the policy of insurance." (Doc. 13 at 18). The ARW documents are obviously material to this affirmative defense, as they relate to instances where plumbing-related problems occurred at the rental property during the time frame leading up to the December 2, 2020, water overflow incident now at issue.

Moreover, presumably recognizing the possible significance of the ARW records, Pitts specifically stated in her initial disclosures that ARW was in possession of potentially relevant information and documents and even contacted ARW herself to secure her policy number, as well as a copy of her policy agreement. (Doc. 59-2 at 3). While it is true that GeoVera should have forwarded the ARW items to Pitts closer in time to its receipt of those documents, it is also true that Pitts was aware that GeoVera had subpoenaed these materials and could have easily followed up with GeoVera on the matter. *See Fox v. Safeco Ins. Co. of Ill.*, 2017 WL 4158765, at *2 (M.D. Fla. Sept. 18, 2017) (concluding that a late-disclosed witness was not a surprise to the plaintiff where the plaintiff had been made aware of the witness at multiple points

during the action); *Succellati Holding Italia SPA v. Laura Buccellati LLC*, 2014 WL 11880980, at *2 (S.D. Fla. Apr. 10, 2014) (same); *see also U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 2009 WL 92826, *4 (M.D. Fla. Jan. 14, 2009) (finding the fact that a movant seeking to strike evidence "ha[d] not established . . . it had no reason to know of [the other party]'s possession of th[e challenged] information" weighed against it on the question of surprise).   Indeed, there is ample case authority for the proposition that the ARW records were in Pitts's possession, custody, or control all along.   *See*, *e.g.*, *Stone Strong, LLC, v. Delzotto Prods. of Fla., Inc.,* 2010 WL 11507441, at *1 * n.1 (M.D. Fla. Mar. 26, 2010) (finding that "[c]ourts have held that a party with the right, authority or ability to obtain the documents upon demand has sufficient control over the documents to be compelled to produce them" and collecting cases); *Safeco Ins. Co. of Am. v. Vecsey*, 259 F.R.D. 23, 29 (D. Conn. 2009) (noting that a document is deemed to be in the "possession, custody or control" of a party where the party "has the legal right to obtain the document, even though in fact it has no copy") (citing 8A CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE, § 2210 (2009 ed.)); *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) ("[D]ocuments are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.") (citations omitted).   For the above reasons, Pitts's assertion that she was somehow caught off guard by GeoVera's reliance on the ARW materials rings hollow.

The second factor—Pitts's capacity to cure the surprise—likewise counsels in favor of GeoVera.  As discussed above, Pitts has not pointed to anything in the record suggesting she could not have obtained the subpoenaed materials from ARW by herself at any point in time, as they pertained to her own insurance policy.  In addition, Pitts's receipt of the documents from GeoVera on March 11, 2022, left her with several weeks in which to conduct the deposition of the ARW records custodian, Rothman, including on the two dates—March 24 or March 25, 2022—proposed by GeoVera. Pitts does not explain why these dates were unsatisfactory and, if so, why she did not simply seek a short extension of the deadlines for discovery and for her response to GeoVera's summary judgment motion, particularly since the CMSO did not require the parties to file their dispositive motions until more than a month later, in early May 2022.  The fact that she moved to strike the contested ARW evidence instead suggests her decision not to pursue a deposition of Rothman more vigorously may have been a calculated one.  *See Cox v. Worldpay US, Inc.*, 2014 WL 4417855, at *3 (M.D. Fla. Sept. 8, 2014) ("It may be true that [the plaintiff] only learned of [the witness's] importance late in the discovery period, and that [the defendant]'s counsel refused to permit [the plaintiff] to depose [the witness] after the close of discovery. However, [the plaintiff] neither subpoenaed [the witness] prior to the discovery deadline, nor sought an extension of the discovery deadline for the purpose of deposing [the witness]. [The plaintiff]'s failure to invoke any formal process to depose [the witness] suggests that [the plaintiff]'s decision to forego [the witness]'s deposition was a strategic one.").

The third factor—the extent to which the ARW materials would disrupt the trial—augurs against Pitts as well.  As explained above, Pitts was on notice of GeoVera's preexisting damages defense since August 2021 when GeoVera filed its answer and was likewise aware of GeoVera's ARW subpoena as of November 2021.  Furthermore, as also explained above, Pitts had a contractual relationship with ARW and therefore had at least constructive (if not direct) knowledge of the claims she made to ARW in connection with the rental property.  And the trial term was not scheduled at the time to commence until October 2022,[4] which was roughly six months after Pitts received the ARW items from GeoVera.  *See Woods v. Progressive Select Ins. Co.*, 2021 WL 3661710, at *2 (M.D. Fla. July 27, 2021) (finding that an untimely disclosure would not disrupt trial where the trial was four months away); *Joslyn v. Essentia Nat. Memory Foam, Inc.*, 2017 WL 5434583, at *3 (S.D. Fla. Jan. 26, 2017) (finding a belated disclosure would not disrupt trial where the evidence was necessary to the defendant's defense and plaintiff was on notice as to what the defendant would need to prove).

The fourth factor—the importance of the ARW materials—additionally supports GeoVera's position.  Given the nature of these subpoenaed records, there can be little question that they are integral to GeoVera's preexisting damages defense.  *See Moyes v. Keiser Sch. Inc*, 2010 WL 3565622, at *1 (N.D. Fla. Sept. 10, 2010) (denying a motion to strike where the challenged evidence was "important in the presentation of the [nonmovant's] case").

---

[4] The trial term has since been moved to November 2022.  (Docs. 77–78.)

The fifth and final factor—GeoVera's explanation for failing to disclose the ARW documents in a timely manner—weighs against it.  Based on GeoVera's representations at oral argument, the only reason it offers in this regard is that it forgot to turn over these materials sooner.  *See also* (Doc. 59 at 5).  Although this is a poor excuse, it does not justify striking this evidence, especially when measured against the other four factors.  *See Moyes*, 2010 WL 3565622, at *1 (denying a motion to strike even though the party's failure to disclose was partly inadvertent).

In sum, GeoVera has carried its burden of showing that its late disclosure of the ARW items was substantially justified and/or harmless.  Accordingly, I respectfully submit that Pitts's motion to strike should be denied.

III.

With the matter of Pitts's motion to strike resolved, I turn to the parties' competing motions for summary judgment.  (Docs. 51, 54).  Because the crux of both of these motions is the same, I will address them together.

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007).  A moving party ordinarily discharges its burden by demonstrating that there is an absence of evidence to buttress the non-movant's case.  *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a movant has satisfied its burden, the non-movant must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or

14

admissions on file) evidencing that there is a disputed question as to a material fact for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). To do so, the non-movant must rely on more than conclusory statements or allegations. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.") (citations omitted). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," a court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to" such relief. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Welding Servs.*, 509 F.3d at 1356. That is, it must credit the evidence tendered by the non-movant and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). In doing so, a court may not "weigh conflicting evidence or make credibility determinations" regarding a party or its presentation of the facts. *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) (citations omitted).

As this is a diversity case, the Court is bound by Florida substantive law. *See Auto-Owners Ins. Co. v. Ralph Gage Contracting, Inc.*, 685 F. App'x 820, 821 (11th Cir. 2017) (per curiam) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In Florida, the interpretation of an insurance policy is solely a legal matter to be decided by the court. *Gas Kwick, Inc. v. United Pac. Ins. Co.*, 58 F.3d 1536, 1538–39 (11th Cir. 1995). Courts in Florida must "'construe[ such contracts] as a whole [so as] to give every

provision its full meaning and operative effect[.]'" *Cameron v. Scottsdale Ins. Co.*, 726 F. App'x 757, 759 (11th Cir. 2018) (per curiam) (quoting *Southern-Owners Ins. Co. v. Easdon Rhodes & Assoc. LLC*, 872 F.3d 1161, 1164 (11th Cir. 2017)); *see also Dahl v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993) (observing that courts interpreting insurance policies "must strive to give meaning to every provision," which means they must "look at [each provision] to determine its meaning within the policy"). In carrying out this task, courts should consider the "language of the policy" to be the "most important factor" in discerning the scope of the policy, and should give the policy's language its plain meaning. *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)). "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Taurus Holdings, Inc.*, 913 So. 2d at 532 (quotation marks and citation omitted).

On the other hand, where the "relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." *Westport Ins. Corp. v. VN Hotel Grp., LLC*, 2011 WL 4804896, at *2 (M.D. Fla. Oct. 11, 2011), *aff'd*, 513 F. App'x 927 (11th Cir. 2013) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). To be deemed ambiguous, "[t]here must be 'a genuine inconsistency, uncertainty, or ambiguity in meaning that remains after resort to the ordinary rules of

construction.'" *Valiant Ins. Co. v. Evonosky*, 864 F. Supp. 1189, 1191 (M.D. Fla. 1994) (quoting *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 942 (Fla. 1979)). A court, however, "may *not* rewrite the policy or add meaning to create an ambiguity." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So. 2d 1245, 1248 (Fla. 1986)). Additionally, "[a]mbiguity is not invariably present when analysis is required to interpret the policy." *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1175 (11th Cir. 1985) (citation omitted). Where a policy provision is determined to be ambiguous, it must be "interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." *Westport Ins. Corp.*, 2011 WL 4804896, at *2 (quoting *Auto-Owners Ins. Co.*, 756 So. 2d at 34). Moreover, "[e]xclusionary clauses are construed even more strictly against the insurer than coverage clauses," and the insurer has the burden of demonstrating that an exclusion in a policy applies. *Id.* (quotation marks and citation omitted).

In this case, the question posed by the parties' dueling summary judgement motions is whether Pitts's policy with GeoVera covers the access-to-repair costs associated with the failed plumbing line that led to the December 2, 2020, water overflow incident at Pitts's rental property. According to Pitts, these costs are necessary because the leak in the property's plumbing system cannot be fixed without first removing "portions of the undamaged [terrazzo] floor and walls" that stand in the way of the work to be done on the compromised piping. (Doc. 53 at 5). GeoVera counters that such expenses are foreclosed by two different provisions in Pitts's policy:

the Water Damage Endorsement and a separate exclusion pertaining to "existing damage." Each of these provisions will be addressed in turn.

A.

To resolve the parties' disagreement regarding the scope of the Water Damage Endorsement, it is necessary to set out the other portions of the policy to which the endorsement relates so that the endorsement can be understood in its proper context. *Cameron*, 726 F. App'x at 759 (noting that courts must construe insurance policies "'as a whole'") (quoting *Southern-Owners Ins.*, 872 F.3d at 1164); *Certain Interested Underwriters at Lloyd's London v. Pitu, Inc.*, 95 So. 3d 290, 292 (Fla. Dist. Ct. App. 2012) (stating that "a single policy provision should not be read in isolation and out of context, for the contract is to be construed according to its entire terms, as set forth in the policy and amplified by the policy application, endorsements, or riders") (quotation marks and citation omitted). The relevant parts of the policy are as follows.

SECTION I – PERILS INSURED AGAINST

A.      Coverage A – Dwelling And Coverage B – Other Structures
      1.      We insure against direct physical loss to property described in Coverages A and B.
            2.      We do not insure, however, for loss:
                  a.      Excluded under Section I – Exclusions;
                  b.      [omitted]
                  c.      Caused by:
                        (1)-(5) [omitted]
                        (6)      Any of the following:
                              (a)      Wear and tear, marring, deterioration[,]
                              (b)-(i) [omitted]

18

* * *

SECTION I – EXCLUSIONS

A.    We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

   3.    Water

(Doc. 51-1 at 45–46, 48).

The above water-exclusion provision in Paragraph A.3 was later modified by

the Water Damage Endorsement, which states:

To the extent that any provision of this endorsement conflicts with any coverage or additional coverage provisions within the policy or other endorsements attached to the policy, the terms of this endorsement shall apply.

* * *

SECTION I – EXCLUSIONS

Paragraph A.3. is replaced by the following:

   3.    "Water Damage"

This policy does not cover "water damage."

However, "water damage" resulting from covered loss caused by:
         a.-i    [nine identified perils, like fire, lightning, etc.]
         is covered, unless such peril is otherwise excluded.

*Id.* at 64–65.

The Water Damage Endorsement also defines "water damage" as follows:

> "Water damage" means damage by water *in any form*, including[,] but not limited to:
>
>     a.    Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of a body of water, or spray from any of these, all whether or not driven by wind, including storm surge;
>
>     b.    Water-borne material or sewage;
>
>     c.    Water that exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure;
>
>     d.    Rain, snow, sleet, ice or hail, whether or not driven by wind;
>
>     e.    Moisture, condensation, humidity or vapor; or
>
>     f.    Pressure or weight of rain, snow, sleet, ice or hail
>
>     g.    *Deterioration, corrosion, blockage, or collapse of a drainage or plumbing system causing backups, seepage, or leakage from plumbing or drain lines at the "residence premises"*;
>
> *regardless of the source or cause of the loss*. . . .

*Id.* at 64 (emphasis added).

Here, Pitts does not assert that the water damage sustained at the rental property on December 2, 2020, was caused by any of the identified perils in the Water Damage Endorsement or that she is entitled to coverage for water damage at all. (Doc. 1-4); (Doc. 51 at 9–10, ¶¶17, 23); (Doc. 51-2 at 77, 80); (Doc. 51-5 at 4); (Doc. 53 at 3–4, ¶¶17, 23); (Doc. 54 at 5, ¶8). Nor does she seek reimbursement for the cost to repair or replace the plumbing system. As alluded to previously, however, she does insist that she is authorized under the policy to recover the access-to-repair costs necessary to fix the failure in the plumbing system. (Doc. 53 at 5–19); (Doc. 54 at 5–19). In support of this contention, Pitts relies on an exception to the above wear-and-tear

exclusion in A.2.c.(6) of the policy (hereinafter, c.(6) exception), which denies coverage for loss "[c]aused by . . . [w]ear and tear, marring, [and] deterioration." (Doc. 53 at 8) (citing Doc. 51-1 at 45); (Doc. 54 at 3) (citing same).  The c.(6) exception is contained in a Master Endorsement to the policy and provides, in pertinent part:

Exception to c.(6)

*Unless the loss is otherwise excluded or limited elsewhere in the policy*, we cover loss to property covered under Coverage A or B resulting from an . . . overflow of water or steam from within a . . . [p]lumbing . . . system . . . on the "residence premises".  *This includes the cost to tear out and repair only that part of a building or only that part of an other [sic] structure covered under Coverage A or B, on the "residence premises", necessary to access and repair the system. . . .  The cost that we will pay for the tear out and repair above is only that cost necessary to access and repair only that portion or part of the system . . . that caused the covered loss, whether the system[,] or any part or portion of the system[,] is repairable or not.*

\* \* \*

However, we do not cover loss: (a) [t]o the system . . . from which this water . . . escaped; [(b) t]o a plumbing system . . . caused by: (i) [a]ge, collapse, obsolescence, wear, tear; (ii) [f]ading, oxidization, weathering; (iii) [d]eterioration, decay, marring, delamination, crumbling, settling, cracking; (iv) [s]hifting, bulging, racking, sagging, bowing, bending, leaning; (v) [s]hrinkage, expansion, contraction, bellying, corrosion; . . . or [(vi) a]ny other age or maintenance related issue[.]

(Doc. 51-1 at 14–15) (emphasis added).

Pitts maintains that the access-to-repair language in the c.(6) exception is "separate," "distinct," and "entirely independent" from the Water Damage Endorsement and that the latter endorsement is thus inapplicable to her insurance

claim or, at the very least, is ambiguous on the matter.  (Doc. 54).  Pitts's contention fails for a number of reasons.

To begin, Pitts's argument ignores the caveat at the beginning of the c.(6) exception, which states that it applies "*unless* the loss [at issue] is otherwise excluded or limited elsewhere in the policy."[5]   (Doc. 51-1 at 14) (emphasis added).  In other words, consideration need not even be given to the potential applicability of the c.(6) exception if there is another provision in the policy that denies coverage for the loss.

This is where the Water Damage Endorsement comes into play.  As noted previously, by its terms, this endorsement disallows any "loss caused directly *or indirectly*" by "water damage[,]" "regardless of [whether] any other cause or event contribut[ed] concurrently or in any sequence to the loss."  *Id.* at 48, 64 (emphasis added).  The endorsement additionally specifies that "water damage" means "damage by water *in any form*," including, but not limited to, "[d]eterioration, corrosion, blockage, or collapse of a drainage or plumbing system causing backups, seepage, or leakage from plumbing or drain lines at the 'residence premises,'" "*regardless of the source or cause of the loss.*"  *Id.* at 64 (emphasis added).  And it makes clear that the terms of the endorsement control irrespective of whether any of its provisions "conflict[ ] with any coverage or additional coverage provisions within the policy or other endorsements attached to the policy."  *Id.*

---

[5] In her summary judgment motion and response to GeoVera's motion, Pitts omits this caveat altogether.  (Doc. 53 at 8); (Doc. 54 at 3).

Stated more simply, outside of the nine identified perils, the Water Damage Endorsement excludes coverage for any loss "caused directly or *indirectly*" by damage by *any* form of water—including "leakage" from plumbing which is the result of "[d]eterioration" of a plumbing system "*regardless* of the *source* or *cause* of the loss." *Id.* at 48, 64 (emphasis added). This language unambiguously encompasses the water damage to Pitts's rental property, which—by Pitts's own acknowledgement— stemmed from the wear and tear to the residence's plumbing system. *See Southern-Owners Ins.*, 872 F.3d at 1164 ("An unambiguous policy provision is 'enforced according to its terms whether it is a basic policy provision or an exclusionary provision.'") (quoting *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963, 965 (Fla. Dist. Ct. App. 1996)). The terms of the Water Damage Endorsement can also be fairly read to foreclose Pitts's claim for the access-to-repair expenses associated with fixing the plumbing system, insofar as such costs are an "indirect" consequence of the loss caused by the water damage to her rental property. *See id.* ("In Florida, the terms used in an insurance contract are given their ordinary meaning[.]").

In an effort to avoid this straightforward interpretation of her policy, Pitts asserts that the Water Damage Endorsement is ambiguous because it does not expressly exclude access-to-repair costs. (Doc. 53 at 15–19); (Doc. 54 at 15–19). It is well established, however, that "'the mere fact that a provision in an insurance policy could be more clearly drafted does not necessarily mean that the provision is otherwise inconsistent, uncertain or ambiguous.'" *GeoVera Spec. Ins. Co. v. Glasser*, 337 So. 3d 8, 13 (Fla. Dist. Ct. App. 2022) (quoting *Pridgen*, 498 So. 2d at 1248). And simply

because multiple policy provisions must be read together does not automatically render the policy ambiguous either. *Id.*

Pitts's position that she is entitled to access-to-repair expenses is untenable for another, albeit related, reason. It cannot be credibly disputed—and Pitts wisely does not try to do so here—that the Water Damage Endorsement precludes coverage for the water damage sustained at Pitts's rental property on December 2, 2020. This fact is important when it comes to the c.(6) exception upon which Pitts relies for her access-to-repair contention. It is evident from a plain reading of this exception that the access-to-repair costs which it describes are tethered to a covered loss. In other words, if there is no covered loss, there are no recoverable access-to-repair expenses.

To see why this is so, one need only look to the language of the exception itself. As referenced above, it states at the beginning, in pertinent part:

> Unless the loss is otherwise excluded or limited elsewhere in the policy, we *cover loss to property* covered under Coverage A . . . resulting from an accidental discharge or overflow of water . . . from within a . . . [p]lumbing . . . system . . . on the "residence premises". This *includes* the cost to tear out and repair only that part of a building . . . covered under Coverage A . . . on the "residence premises", necessary to access and repair the system. . . .

(Doc. 51-1 at 14) (emphasis added).

Independent of the caveat about losses being "otherwise excluded or limited elsewhere in the policy," the remaining verbiage is instructive in evaluating Pitts's c.(6) exception argument. This is because by employing the term "includes," the exception explicitly links the loss to property "from an accidental discharge or overflow of water

24

. . . from within . . . [p]lumbing" to the costs "necessary to access and repair the system or appliance" (i.e., the access-to-repair costs).  The clear import of this language is that, contrary to Pitts's assertions, the access-to-repair expenses covered under the policy are part of, and subsumed within, a covered loss from the specified water damage.

The subsequent language in the c.(6) exception buttresses this interpretation.  As discussed earlier, that language states that "[t]he cost that [GeoVera] will pay for the tear out and repair above is only that cost necessary to access and repair that portion or part[ ] of the system . . . that *caused the covered loss . . . .*"  *Id.* (emphasis added).  This wording again directly ties the access-to-repair expenses to a "covered loss."  *See Glaser v. GeoVera Spec. Ins. Co.*, 420 F. Supp. 3d 1287, 1295–96 (M.D. Fla. 2019) ("[A]n exception to an exclusion does not create coverage under Florida law. . . .  [A plaintiff] must show either the supposed exclusion does not apply, or the exception to the applicable exclusion does apply.") (citing *Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.*, 227 F. Supp. 2d 1248, 1263 (M.D. Fla. 2002)).

This construction of the access-to-repair language in the c.(6) exception is further bolstered by Fourth District Court of Appeal's recent decision in *Panettieri v. People's Trust Insurance Company*, 2022 WL 2962558 (Fla. Dist. Ct. App. July 27, 2022).  In that case, the insured's residence suffered water damage caused by wear and tear, deterioration, and corrosion of the home's plumbing system.  *Id.* at *1.  After determining that the insured's policy did not cover the water damage under one endorsement, the court had to address whether another endorsement in the policy—

which closely parallels the language in the c.(6) exception in this case—limited the insured access-to-repair expenses.[6]  Akin to Pitts's argument here, the insured argued that the latter endorsement did not restrict his access-to-repair costs because such costs were "expressly provided for in a different section of the policy, or at the least, coverage [on the matter was] ambiguous and thus should be construed in his favor."

*Id.* at *3.  The court rejected this contention, reasoning:

> [a] plain reading of the exception . . . indicates that tear out coverage is *included as part* of <u>the loss</u> to property unless <u>the loss</u> is excluded. Therefore, no separate and distinct coverage exists for tear out costs apart from water damage, as [the i]nsured argues.  The [exception] simply defines tear out coverage as included as part of covered loss to property, but excluded when *the loss* is excluded.

> [And because] the loss caused by water damage is excluded by the [policy], the loss, including tear out costs, is otherwise excluded in the policy, and thus, the exception . . . does not provide coverage for tear out costs[.]   As a result, no ambiguity or conflict exists within these provisions of the policy.

*Id.* at *3–4.

---

[6] The exception in *Panettieri* stated, in particular:
> Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from an accidental discharge or overflow of water . . . from within a:
>
> * * *
>
> ii. Plumbing . . . system . . . on the "residence premises".  *This includes the cost to tear out and replace any part of a building . . . on the "residence premises", but only when necessary to repair the system.* . . .

2022 WL 2962558, at *3 (emphasis added).

Other courts that have been called upon to interpret similar language have reached a conclusion consistent with the court in *Panettieri*. *See, e.g.*, *Floyd v. GeoVera Specialty Ins. Co.*, 2020 WL 998690, at *4 (M.D. Fla. Mar. 2, 2020) ("*Once coverage is triggered for water damage under the [policy,]* the [p]olicy offers additional coverage for costs related to the deteriorated plumbing system.") (emphasis added); *see also Deputy v. Hartford Ins. Co. of the Midwest*, 2020 WL 5807997, at *14–15 (M.D. Fla. June 1, 2020) (Covington, J.) (agreeing with the finding in *Floyd* that "[o]nce coverage is triggered for water damage under the [policy,] the [p]olicy offers additional coverage for costs related to the deteriorated plumbing system"); *Herrington v. Certain Underwriters at Lloyd's London*, ___ So. 3d ___, 2022 WL 2335065, at *2 (Fla. Dist. Ct. App. June 29, 2022) ("Insured argues that 'tear out' expenses are not 'damages' and thus not subject to the endorsement limitation. We disagree. The policy language covers 'loss caused by the water including the cost of tearing out' parts of the structure to repair the system which leaked. 'Tear out' costs are thus part of the water damage loss. Therefore, the endorsement limiting all water damage loss includes tear out expenses."); *Jones et al. v. GeoVera*, No. COCE19019264 (Fla. Cir. Ct. Mar. 26, 2020) (characterizing the plaintiffs' argument as "confounding," where the plaintiffs claimed they were entitled to access-to-repair costs even though they acknowledged that the underlying cause of the damage was excluded under their policy) (citation omitted).

The cases cited by Pitts do not undermine this conclusion. Many of these decisions involve materially different policy language and/or issues and are thus not relevant to the Court's analysis. *See, e.g.*, *Jones v. Geovera Specialty Ins. Co.*, No. 16-2018-

27

CA003377 (Fla. Cir. Ct. Nov. 8, 2019) (involving a "Limited Smog, Rust, Mold, Rot, or Bacteria Coverage and Limited Seepage or Leakage Coverage" endorsement); *Deputy*, 2020 WL 5807997, at *15 (observing that the matter before the court was not whether tear-out costs were covered under the plaintiff's policy (as the parties agreed that they were) but what the extent of those costs were); *Jones v. Fednat Ins. Co.*, No. 052018CA057151 (Fla. Cir. Ct. Mar. 3, 2020) (finding that tear out costs were covered under the plaintiff's policy based on materially different policy language); *Mitchell, et al. v. People's Trust Ins. Co.*, No. 19000514CA (Fla. Cir. Ct. Jan. 30, 2020) (same); *Serres v. Sec. First Ins. Co.*, No. 2018-CA-7534-0 (Fla. Cir. Ct. May 13, 2019) (same); *Blanchett v. Sec. First Ins. Co.*, No. 29-2017-CA-009139-A001-HC (Fla. Cir. Ct. July 9, 2018) (same); *Lopez v. Federated Nat'l Ins. Co.*, No. 2017-023226-CA-01 (Fla. Cir. Ct. July 11, 2018) (same); *Liebel v. Nationwide Ins. Co. of Fla.*, 22 So. 3d 111, 117 (Fla. Dist. Ct. App. 2009) (same).  Even were these opinions on point, the majority of them were issued by Florida circuit courts and are thus not binding on the Court in any event.  *See Cameron*, 726 F. App'x at 759 (noting that a federal court analyzing issues of state law is bound by the decisions of the Florida Supreme Court and Florida appellate courts "absent some persuasive indication that the Florida Supreme Court would decide the issue differently") (citing *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir. 2004)).

Other cases cited by Pitts simply do not support her position at all.  *See, e.g.*, *Cameron*, 726 F. App'x at 759 n.1 ("When 'water damage' is covered, the policy

extends to cover 'the cost to tear out and replace any part of the building or structure to repair damage to the system. . . .'"); *Floyd*, 2020 WL 998690, at *4 ("Once coverage is triggered for water damage under the 'Exception To c.(6),' the Policy offers additional coverage for costs related to the deteriorated plumbing system.").

The only decision that Pitts does reference that could arguably be viewed as buttressing her argument is *Wainwright, et al. v. GeoVera Specialty Ins. Co.*, No. CACE18007204 (Fla. Cir. Ct. Dec. 14, 2020). In that case, the plaintiffs sought access-to-repair costs associated with fixing a bathroom drain line which failed due to corrosion, and which caused water damage to the home. *Id.* at 1. Portions of the policy—including a Water Damage Endorsement—were very similar to the policy here, in that a loss due to wear and tear was excluded, except for a loss resulting from an "accidental discharge or overflow of water" from within a plumbing system, including access-to-repair costs. *Id.* The court in *Wainwright* found that the exception for the accidental discharge or overflow of water afforded coverage for *both* the water damage at issue and the plaintiffs' access-to-repair costs.

Pitts's reliance on *Wainwright* is unpersuasive. As an initial matter, it is a Florida circuit court decision and is therefore not binding on the Court. *See Cameron*, 726 F. App'x at 759. In addition, its determination that the policy did not exclude water damage in the first instance does not comport with the plain language of the Water Damage Endorsement and reflects an interpretation of that endorsement which even Pitts does not argue in this action.

Furthermore, the court in *Wainwright* never directly addresses the issue before the Court here, which is whether an insured like Pitts can recover access-to-repair costs under the c.(6) exception even where she is *not* entitled to coverage for the underlying water damage. To the extent that *Wainwright* can be read that broadly, it conflicts with the Fourth District Court of Appeal's subsequent decision in *Panettieri*, which constitutes binding authority "absent some persuasive indication that the Florida Supreme Court would decide the issue differently." *Cameron*, 726 F. App'x at 759.

In sum, because it is clear that Pitts's policy with GeoVera excludes the sought-after access-to-repair costs based upon the Water Damage Endorsement and the other circumstances presented, I recommend granting GeoVera's summary judgment motion and denying Pitts's motion on this issue.[7]

B.

If the Court accepts my findings on the scope of the Water Damage Exclusion and the c.(6) exception, it need not address GeoVera's alternative "existing damages" argument. *See Gonzalez v. United States*, 2019 WL 12520071, at *5 n.8 (S.D. Fla. Apr. 9, 2019) (declining to consider the remaining arguments on an issue where the court found grounds to grant summary judgment and collecting cases). I do so here in the interest of completeness.

---

[7] GeoVera separately contends that Pitts is foreclosed from recovering access-to-repair costs under the policy's ensuing loss clause. (Doc. 51 at 20–21). Pitts, however, does not seek to obtain such costs on that basis. The matter is therefore not before the Court.

As detailed previously, Pitts complained to ARW on a number of occasions between Fall 2019 and Summer 2020 about various plumbing problems at her rental property. Based on these plumbing issues, GeoVera now asserts in its summary judgment motion that its policy precludes Pitts's claim because her loss—caused, as it was, by water apparently escaping from a leaking pipe—is related to the faulty plumbing that existed prior to the policy's purported inception in May 2020. (Doc. 51 at 22–24). In support of this contention, GeoVera cites a provision in the policy excluding existing damages, which are defined in the policy as:

> Damages which occurred prior to policy inception regardless of whether such damages were apparent at the time of the inception of this policy or discovered at a later date; or

> Claims or damages arising out of workmanship, repairs or lack of repairs arising from damage which occurred prior to policy inception.

(Doc. 51-1 at 16).

The threshold question posed by GeoVera's existing damages defense is whether it is properly before the Court. Notwithstanding Pitts's protestations otherwise (Doc. 54 at 20), I find that it is. To start, as noted above, the c.(6) exception upon which Pitts relies to argue in favor of coverage for the sought-after access-to-repair costs applies only if the loss is not "otherwise excluded or limited elsewhere in the policy[.]" (Doc. 51-1 at 14). To the extent the policy's "existing damages" language might "exclude" or materially "limit" Pitts's claimed coverage, the Court must at least consider it. Moreover, GeoVera raised the existing damages issue as an affirmative defense in its answer (Doc. 13 at 18–19), which means it may validly seek

31

summary judgment on this basis.  *See Scottsdale Ins. Co. v. Pushing Daizies, Inc.*, 2017 WL 3706010, at *3 (M.D. Fla. Aug. 28, 2017) (finding a plaintiff had notice of an affirmative defense where the defendant cited "portions of the insurance policy, or its exclusions, that it allege[d] would result in a finding that it is not liable for the relief" sought) (citation omitted).

While it prevails on this threshold issue, GeoVera's existing damages argument fails because it has not sufficiently developed it.[8]  *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that a court need not consider "perfunctory and underdeveloped" arguments).  All that GeoVera essentially contends in its motion is that "[t]he undisputed record evidence establishe[s] that the problems with the plumbing system and repairs, or lack of repairs to the plumbing system, at the [p]roperty indisputably occurred prior to the inception of [Pitts]'s Policy." (Doc. 51 at 23); *see also* (Doc. 60 at 7) (claiming only that the plumbing issues "occurred prior to the Policy inception").  Such a conclusory assertion is plainly insufficient.  This is especially true since, by my view, there appears to be a real question as to whether the alleged pre-policy clogs at the property were the product of the same damage that caused the water overflow incident on December 2, 2020.  I note in this regard that although GeoVera claims to identify two plumbing issues that predated Pitts's current policy—namely, the September 2019 and the April 2020 bathtub stoppages (Doc. 51 at 23) (citing Doc. 51-3 at 18–19), Pitts maintains in her affidavit that those blockages

---

[8] Solely for purposes of my analysis, I assume, without deciding, that the policy's "inception" was May 2020.

stemmed from her tenant's children placing toys and food in the bathtub drain (Doc. 53 at 20) (citing Doc. 53-1 at 4–5); (Doc. 54 at 20).   GeoVera does not address this claim, let alone contest it, either in its reply to Pitts's response to its summary judgment motion (Doc. 60) or in its response to Pitts's summary judgment motion (Doc. 62).

GeoVera's reliance on the May 2020 toilet clog believed to be caused by tree roots fares no better.   (Doc. 51 at 23) (citing 51-3 at 20).   Not only did this issue arise during the term of Pitts's policy, there is no evidence connecting the tree roots to the particular plumbing system failure at issue here or establishing that the tree roots caused problems prior to the policy's inception.   Therefore, I respectfully recommend that GeoVera's summary judgment motion on its existing damages defense be denied. *See N. Am. Specialty Ins. Co. v. J.R.S. Equities, Inc.*, 2005 WL 8154106, at *5 (N.D. Ga. Aug. 17, 2005) (denying summary judgment on a declaratory judgment complaint concerning pre-existing damage where the claimed damage may have occurred during or been in the process of occurring within the term of the policy at issue) (citing *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1359 (M.D. Fla. 2001) for the proposition that "[w]hen an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation").

IV.

For the foregoing reasons, I recommend:

1.      *Defendant's Motion for Summary Judgment* (Doc. 51) be granted in part and denied in part as described more fully above.

2.      *Plaintiff's Motion to Strike Untimely Disclosed Summary Judgment Evidence from Defendant's Motion for Summary Judgment* (Doc. 52) be denied.

3.      *Plaintiff's Motion for Summary Judgment* (Doc. 54) be denied.

4.      The Clerk of Court be directed to enter Judgment in the Defendant's favor and to close the case.

Respectfully submitted this 7th day of September 2022.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

34

Copies to:
Honorable Virginia M. Hernandez Covington, United States District Judge
Counsel of record